**Debra NIELSEN, et al., Plaintiffs,**

v.

**VILLAGE OF LAKE IN THE HILLS, et al., Defendants.**

**No. 95 C 3995.**

United States District Court, N.D. Illinois, Eastern Division.

Dec. 18, 1996.

Linda Spak, Chicago, IL, for Plaintiff.

Richard T. Wimmer, Dennis G. Walsh, James V. Ferolo, Michael T. Jurusik, Klein, Thorpe & Jenkins, Ltd., Chicago, IL, for Defendants Village of Lake in the Hills, Officer Larry Wright and Officer Eric Decker.

Jeffrey M. Randall, Robbins, Salomon & Patt, Ltd., Glenview, IL, for Karen Callahan.

### MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

Debra Nielsen ("Debra") and her husband William ("William") (collectively "Nielsens") initially sued Village of Lake in the Hills ("Village"), its Officers Larry Wright ("Wright") and Eric Decker ("Decker") and two private individuals—Karen Callahan ("Callahan") and Wanda Totosian ("Totosian")—under 42 U.S.C. § 1983 ("Section 1983") and Illinois common law. Debra charged Wright, Decker, Callahan and Totosian under Section 1983 with two violations of her Fourth Amendment right to be free from unreasonable seizure [1]—one violation in hav-

---

1. As always, this opinion adheres to the conventional and convenient (though technically imprecise) practice of referring to the Fourth Amendment's underlying Bill of Rights provision (which of course imposes limitations only on the federal government) rather than to the Fourteenth Amendment (which applies to state actors and

ing arrested her (or having caused her to be arrested) without probable cause and the other in having subjected her to false imprisonment—and under Illinois common law with intentional infliction of emotional distress, false arrest, false imprisonment, abuse of process and malicious prosecution. Debra charged Village with municipal liability under Section 1983 for violation of her Fourth Amendment right against unreasonable seizure. Finally, William sued defendants for loss of consortium of his wife due to the injuries of which she complains.

This Court's September 26, 1995 oral order dismissed Debra's claims for intentional infliction of emotional distress (Count IV) and abuse of process (Count VI). Both Nielsens then dismissed Totosian as a defendant. All remaining defendants now move under Fed. R.Civ.P. ("Rule") 56 for summary judgment as to all surviving claims, and their motions are fully briefed and ready for decision.[2] For the reasons stated in this memorandum opinion and order, the motions are granted and this action is dismissed.

### Summary Judgment Standards

■ Familiar Rule 56 principles impose on parties moving for summary judgment the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). For that purpose this Court is "not required to draw every conceivable inference from the record—only those inferences that are reasonable"—in the light most favorable to nonmoving parties (*Bank Leumi Le–Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir.1991) and

cases cited there). As with every summary judgment motion, this Court accepts nonmovants Nielsens' version of any disputed facts.

### Facts

In 1994[3] Nielsens, Callahan and Totosian all lived on the 100 block of Hunters Path in Village. Nielsens lived at 117 Hunters Path, Callahan lived next door at 115 and Totosian lived across the street at 118 (V.12(M) ¶ 3). Their three households shared mailboxes located "within inches of each other" on the south side of Hunters Path (Decker Aff. ¶ 8). For some time before the summer of 1994 the households had engaged in a number of disputes, including incidents of egg tossing, pumpkin smashing and threats of physical violence (N. 12(N) ¶ 4; Wright Aff. ¶ 5).

Beginning in late 1993 or early 1994, Callahan also began to suspect that someone was tampering with her mail (V.12(M) ¶ 5; Wright Aff. ¶ 6). Although Debra has denied removing mail "from anyone's mailbox but my own" (Nielsen Aff. ¶ 6), Callahan's son Joseph ("Joseph") reports seeing her take mail from the Callahan mailbox on May 5. While resting at home with asthma at about 3 p.m. that day, Joseph noticed a person— whom he was able to identify "with certainty" as Debra—reach into the Callahan mailbox and remove what appeared to be a music catalog (V.12(M) ¶¶ 6–9; J. Callahan Aff. I ¶¶ 8–9[4]). After looking through the catalog, Debra assertedly tossed it into a garbage receptacle on the street awaiting removal (V.12(M) ¶ 9; J. Callahan Aff. I ¶ 10).

Joseph reported the incident by phone to his mother at work (V.12(M) ¶ 10). In turn

---

has been construed to embody such Bill of Rights guaranties).

**2.** This District Court has designed GR 12 to facilitate the resolution of Rule 56 motions by highlighting the existence or nonexistence of factual disputes. GR 12(M) requires a Rule 56 movant to submit a statement of assertedly uncontested facts, with citations to the record in support of those facts. Then GR 12(N) requires the nonmoving party to respond point by point, with citations to the record in support of (1) any claimed disputes as to the movant's version of the facts and (2) any additional facts that the nonmovant chooses to assert. Village, Wright and Decker are represented by the same counsel

and have jointly filed all their submissions, and Callahan has adopted substantially all of their filings. Their GR 12(M) statements will be cited "V. 12(M) ¶ —," with their response to Nielsens' GR 12(N) statement being cited "V. 12(M) R. ¶ —." Nielsens' GR 12(N) statement will be cited "N. 12(N) ¶ —."

**3.** Wherever a date is specified here without designating a year, it refers to a 1994 occurrence.

**4.** Two affidavits by Joseph Callahan are contained in the record: one subscribed and sworn to on August 25, 1996, cited "J. Callahan Aff. I ¶ —," and the other subscribed and sworn to on October 23, 1996, cited "J. Callahan Aff. II ¶ —."

she called Village's Police Department to report what had occurred (V.12(M) ¶ 11), and she was advised to call the post office (N. 12(N) ¶ 11). When Callahan notified a postal inspector of Debra's alleged theft and further reported that her mail had been missing on other occasions, the inspector offered to investigate Callahan's complaint. For that purpose the inspector and Callahan agreed to count the number of items delivered to and received by the Callahan residence each week (V.12(M) ¶ 13–14). That went on for several weeks, and each week a discrepancy was found between the number of items delivered by the post office and the number of items received by the Callahan family (V.12(M) ¶ 15).

Meanwhile, on May 5 Callahan had also taken Joseph to the Police Department to report what he had seen. At the station Joseph discussed his observations with Wright (V.12(M) ¶ 10; J. Callahan Aff. I ¶¶ 11–13; Wright Aff. ¶ 8). Ultimately Joseph made out a written statement of the incident before Wright and Callahan (J. Callahan Aff. I ¶ 14; J. Callahan Aff. II ¶ 4; Wright Aff. ¶ 8; K. Callahan Aff. ¶¶ 3–4). Nielsens now call the authenticity of Joseph's signature on that document into question (N. 12(N) ¶¶ 6–10; Hennessy Aff. ¶ 3).

On May 25 Callahan again called the Police Department, reporting to Wright that her mail remained the subject of tampering (V.12(M) ¶ 16; Wright Aff. ¶ 9). Wright then spoke with Postal Service Supervisor Jim Brenner ("Brenner"), who referred him to Postal Service Inspector Robert Smith ("Smith") (Wright Aff. ¶¶ 10–11). After Wright discussed Callahan's complaints with Smith, the Postal Service and the Village Police Department jointly decided to conduct surveillance of the Nielsen–Totosian–Callahan mailboxes (V.12(M) ¶ 19; Wright Aff. ¶ 12).

At about 12:15 p.m. on May 26, Decker and Smith arrived at the 100 Block of Hunters Path to conduct such surveillance (Decker Aff. ¶ 9). They parked their Dodge Caravan about 20 to 30 yards from the Nielsen–Toto-

sian–Callahan mailboxes, positioning the van with its rear facing the mailboxes to allow the taking of still photos and a camcorder video through the van's windows (V.12(M) ¶¶ 20–21; Decker Aff. ¶ 9).

At 12:44 p.m. the two officers witnessed the delivery of mail (V.12(M) ¶ 22; Decker Aff. ¶ 11). At 12:46 p.m. they saw a Sterling automobile licensed to Nielsens pull out of Nielsens' driveway and approach the mailboxes (V.12(M) ¶ 23; Decker Aff. ¶ 12). First the driver of the Sterling vehicle removed items from the Nielsens' mailbox, then the driver pulled up several inches and twice removed items from the Totosian household mailbox (V.12(M) ¶¶ 24–27). Finally the Sterling automobile drove away from the mailboxes and directly past the van occupied by Decker and Smith (V.12(M) ¶ 28).

Although windshield glare had kept the two officers from identifying the Sterling's driver to that point, they were able to see the driver with a "clear and unobstructed view" as she passed "within only a few feet of the van's window" (Decker Aff. ¶ 20). Decker could "positively identify" the driver as Debra (Decker Aff. ¶ 20), for he had become familiar with her while responding to an earlier neighborhood incident (Decker Aff. ¶ 3). Smith was able to identify the driver only as a female in her late thirties or early forties (V.12(M) ¶ 30).[5] No one at the Totosian household had given Debra permission to remove items from the Totosian mailbox, and the items taken from that mailbox on May 5 were not returned (Decker Aff. ¶¶ 17, 23).

Based upon his observations and investigations, Decker signed a criminal complaint against Debra on July 9, charging her with knowingly exerting unauthorized control over property of Totosian having a property value of less than $300 (Decker Aff. ¶ 23). Similarly, based upon his investigations and discussions with Callahan and her son Joseph, Wright signed a criminal complaint against Debra for the same charge as to depriving Callahan of her property (Wright Aff. ¶ 13). On July 12, after appearing voluntarily and

---

5. Based on the date of birth included in Debra's arrest report (8–11–53), she would have been 40 years old in May 1994.

being questioned by Wright at the Village Police Department (Nielsens' Answer to First Set of Interrogs. ¶ 3), Debra was arrested on the criminal complaints signed by Wright and Decker (V.12(M) ¶ 34). After her arrest was processed, Debra was released on a cash bond (Wright Aff. ¶ 14).

Although the State pursued charges against Debra under the Illinois general theft statute, 720 ILCS 5/16–1, those charges were dismissed in the Circuit Court on September 24 when Judge Arnold ruled that federal courts have exclusive jurisdiction over criminal offenses involving the United States mail (Nielsens' Ex. 9). On July 11, 1995 Nielsens brought this action, and the proceedings described in the introductory section of this opinion then ensued.

### Counts I and II: False Arrest/False Imprisonment

Complaint Counts I and II set out Debra's Section 1983 charges against Wright, Decker and Callahan for conspiring to violate her Fourth Amendment right against unreasonable seizure. Debra alleges that they conspired to have Debra arrested in bad faith and for the personal benefit of Callahan and Totosian. More specifically, Debra asserts that Callahan conspired to file false police reports and that Wright and Decker conspired to arrest Debra without probable cause for a crime they knew had not be committed.

■ Section 1983 provides a remedy for injured parties who have been deprived of a federally guaranteed right "under color of" state law. Ordinarily, then, the target of a Section 1983 claim is a state, one of its lesser governmental units or some officially designated officer of a state or such lesser unit. As recently reconfirmed in *Vickery v. Jones*, 100 F.3d 1334, 1343 (7th Cir.1996), quoting from *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152, 90 S.Ct. 1598, 1605, 26 L.Ed.2d 142 (1970)(emphasis in original), private individuals act "under color of" state law—and thus are subject to suit under Section 1983—only where jointly engaged with a public official in the deprivation of federal rights:

Private persons, *jointly engaged with state officials in the prohibited action*, are act-

ing "under color" of law for purposes of the statute. To act "under color" of law does not require that the accused be an officer of the State. It is enough that he is a *willful participant in joint activity* with the State or its agents.

Because examination of Debra's Section 1983 claims against Callahan necessarily includes that additional inquiry, this opinion first considers the Section 1983 charges against Wright and Decker.

### Section 1983 Claims Against Wright and Decker

Chief Justice Rehnquist's plurality opinion in *Albright v. Oliver*, 510 U.S. 266, 271, 114 S.Ct. 807, 811, 127 L.Ed.2d 114 (1994) (citations omitted) provides a succinct statement of the province of Section 1983 and the initial methodology for calling it into play:

Section 1983 "is not itself a source of substantive rights," but merely provides "a method for vindicating federal rights elsewhere conferred." The first step in any such claim is to identify the specific constitutional right allegedly infringed.

And as *Graham v. Connor*, 490 U.S. 386, 394, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989) had earlier taught:

The validity of the claim must then be judged by reference to the specific constitutional standard which governs that right. . . .

In contending that her Fourth Amendment rights have been violated, Debra has invoked the correct legal source. That Amendment expressly declares the "right of the people to be secure in their persons . . . against unreasonable searches and seizures," and an arrest is "quintessentially a seizure" (*Bell v. City of Milwaukee*, 746 F.2d 1205, 1278 (7th Cir. 1984), quoting *United States v. Watson*, 423 U.S. 411, 428, 96 S.Ct. 820, 830, 46 L.Ed.2d 598 (1976) (Powell, J., concurring)). This opinion, then, examines Debra's arrest through the relevant lens of reasonableness.

■ Any arrest is deemed reasonable in Fourth Amendment terms "so long as the police are doing no more than they are legally permitted and objectively authorized to do" (*United States v. Woody*, 55 F.3d 1257,

1268 (7th Cir.1995), quoting *United States v. Trigg,* 878 F.2d 1037, 1041 (7th Cir.1989)). As announced in *Trigg, id.,* that test turns upon the existence of two objective factors:

> First, did the arresting officer have probable cause to believe that the defendant had committed or was committing an offense. Second, was the arresting officer authorized by state and or municipal law to effect a custodial arrest for the particular offense.

Those factors will be addressed here in turn.

■ First, did Wright have probable cause to believe that Debra had committed the thefts with which she was charged? Probable cause to arrest exists for a law enforcement officer when "the facts and circumstances within [his] knowledge and of which [he has] reasonably trustworthy information [are] sufficient to warrant a prudent [person] in believing that the [suspect] had committed or was committing an offense" (*Booker v. Ward,* 94 F.3d 1052, 1057 (7th Cir.1996), quoting *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964)(alterations in original)). Further, probable cause is to be evaluated "not on the facts as an omniscient observer would perceive them but on the facts as they would have appeared to a reasonable person *in the position of the arresting officer*—seeing what he saw, hearing what he heard" (*Booker,* 94 F.3d at 1057–58 (emphasis in original)).

In terms of what Wright understood to be the situation at the time of Debra's July 12 arrest, he readily satisfies that objective standard for probable cause. As for the alleged May 5 theft from the Callahans' mailbox, Wright had probable cause to arrest Debra based on the eyewitness account of Joseph Callahan—a witness quite familiar with Debra and who had identified her as the perpetrator "with certainty" (J. Callahan Aff. I ¶ 9). *Gramenos v. Jewel Cos.,* 797 F.2d 432, 439 (7th Cir.1986) (citations omitted) has found an officer's reliance on a direct eyewitness account particularly persuasive to a determination of probable cause:

> In Illinois the report of an eyewitness to a crime is sufficient to authorize an arrest. The Supreme Court has not spoken on the question, but the formulae for probable cause, such as "a probability or substantial chance of criminal activity, not an actual showing of such activity," or "facts and circumstances known to the officer [that] warrant a prudent man in believing that an offense has been committed," do not suggest that an officer risks his career and his fortune by believing an apparently sober eyewitness to a crime.

Even if Wright had cause to be suspicious of the Callahans' story because he knew of ongoing neighborhood disputes and a possible "grudge" by Joseph Callahan (Wright Aff. ¶ 5), Wright properly investigated Joseph's report by interviewing him (*id.* ¶ 8), speaking with officials at the Postal Service (*id.* ¶¶ 10–12) and Debra before her arrest (Nielsens' Answer to First Set of Interrogs. ¶ 3) (a course of police activity entirely comparable to that approved in *Hebron v. Touhy,* 18 F.3d 421, 422–23 (7th Cir.1994)). Joseph travelled to the Village Police Department on the very day he claimed to have witnessed Debra's theft and provided Wright with a detailed account of what he had witnessed (Wright Aff. ¶ 4). Debra has raised no issue of material fact to suggest that Wright was unreasonable in relying on Joseph's report.

■ Further and independently,[6] Wright had probable cause for Debra's July 12 ar-

---

**6.** As noted in *Biddle v. Martin,* 992 F.2d 673, 676 (7th Cir.1993), "in § 1983 actions for false arrest, probable cause need not have existed for the charge for which the plaintiff was arrested, so long as probable cause existed for arrest on a closely related charge." That rule most frequently comes into play where an officer defends against a Section 1983 claim by arguing that even if probable cause did not exist to justify an arrest based upon a particular charge, the defendant's *very same conduct* provided sufficient probable cause for a related (if perhaps slightly different or lesser) charge. But the rule is equally applicable to this case. Where an officer relies upon two distinct factual bases (and thus correspondingly two distinct legal charges) to arrest an individual, the existence of probable cause as to either charge—which alone is sufficient to justify an arrest—is a proper defense to a Section 1983 action based on that single arrest. Probable cause for the justified charge is sufficient to deem the state's intrusion "reasonable." Hence the existence of a second proffered charge for which probable cause is lacking would be irrelevant for Fourth Amendment purposes, so long as that insufficient predicate for arrest does not

rest based on the investigation and criminal complaint of Decker. In the surveillance operation conducted jointly by the Village Police Department and the Postal Service, Decker was an eyewitness to Debra's alleged May 26 theft from the Totosian mailbox (Decker Aff. ¶ 16). Familiar with Debra from an earlier neighborhood incident on the 100 block of Hunters Path (Decker Aff. ¶ 3), Decker was able to "positively identify" Debra as the culprit (Decker Aff. ¶ 20). Decker recorded his May 26 surveillance of Debra on videotape (Defs.' Ex. B), confirmed with Totosian that Debra had no permission to remove mail from the Totosians' mailbox and later signed a criminal complaint against Debra (Decker Aff. ¶ 23). Debra has identified no issue of material fact to suggest that Wright was unreasonable in relying on Decker's investigation for the July 12 arrest.

With Wright and Decker having moved for summary judgment and having offered evidence as to probable cause supporting their actions, Debra must come forward with some evidence to show that there is an issue of fact on that score (*Simmons v. Pryor*, 26 F.3d 650, 653 (7th Cir.1993)). Those efforts end in utter failure. No issue of fact as to probable cause can be said to exist regarding Debra's arrest for Totosian's theft just because Decker, rather than Totosian, signed a criminal complaint—Decker was an eyewitness to the alleged theft. Additionally, no issue of fact is presented because Debra is not identifiable from the surveillance film alone—Decker was

able to identify Debra first-hand on May 26 from a "clear and unobstructed view" (Decker Aff. ¶ 20). Finally, Wright's decision to postpone Debra's arrest for the Callahan theft until the conclusion of the joint surveillance does not present an issue of fact as to the probable cause for that arrest—both because Wright continued his own investigation after May 5 (Wright Aff. ¶¶ 9–12) and because Nielsens have suggested no reason why Joseph Callahan's eyewitness account might have become less credible in the interim.

Nielsens' final challenge to the existence of probable cause is an attack on the authenticity of Joseph's signature on his written statement to Wright (J. Callahan Aff. I ¶ 14, Ex.). They present the testimony of "questioned document examiner" Darlene Hennessy ("Hennessy"), who concludes "based on a reasonable degree of scientific certainty" that the signature on Joseph's May 5 statement to the Village Police Department was not written by the same person who signed Joseph's August 25, 1995 affidavit.[7] As defendants have pointed out, the reliability of Hennessy's conclusion is suspect in her own terms,[8] let alone under a *Daubert*-type analysis. Nonetheless it will be taken as true for purposes of the current motion.

Accordingly this opinion will proceed on the assumption that Joseph did not in fact personally sign his May 5 statement to Wright. But that does not create an issue of

---

somehow create a greater intrusion upon the defendant's privacy interests. As quoted in *Biddle, id.* (citation omitted, emphasis in original):

> While an arresting officer's subjective knowledge of facts sufficient to constitute probable cause is central to evaluation of the propriety of an arrest, we do not believe that the officer's view of the *legal basis* for the arrest is important. Under the principles of *Harlow v. Fitzgerald* and the fourth amendment, an objective standard applies where the parties present alternative legal justifications for an arrest.

7. Defendants object to the "unqualified expert opinion" of Hennessy because her identity was not disclosed to them until the October 17, 1996 filing of her written opinion and affidavit—months after the June 28, 1996 close of discovery (V.12(M) R. ¶¶ 6–9(A)). But defendants fail to acknowledge that Joseph's affidavit signature was not available to Nielsens for comparison

until defendants' August 30, 1996 filing. In any event, to confirm the dismissal of Nielsens' claim under even the most favorable scenario, this opinion will consider Hennessy's opinion for purposes of the present motion.

8. Hennessy's report concludes that "to determine the writer of a signature it is important to have a sufficient amount of naturally written standards so that the writer's range of normal variation can be observed" (Hennessy Aff. ¶ 7, Ex.). But Hennessy had only two *photocopied* examples of Joseph Callahan's signature to compare, and Hennessy herself challenges the authenticity of the August 25 signature for "apparent lack of naturalness" (Hennessy Aff. ¶ 4). Further, Hennessy specifically "reserves the right to conduct another examination" should the "original document" and "additional authentic standards" become available to her (Hennessy Aff. ¶ 7, Ex.).

material fact as to whether Wright had probable cause to arrest Debra. It is undisputed that Joseph reported his detailed observations of the May 5 mail theft to his mother, that he travelled to the Police Department and that he discussed those same observations *orally* with Wright. Nielsens identify no evidence to suggest that those matters— as reported by Callahan (Callahan Dep. 21), Joseph (J. Callahan Aff. I ¶¶ 13–14), and Wright (Wright Aff. ¶ 8)—have been fabricated. Thus even if Joseph's May 5 written statement were to be totally excluded from the record, Wright had ample evidence based on his conversation with Joseph and on his independent investigation for a more than reasonable belief that Debra had committed the May 5 theft. Consequently Nielsens have identified no issue of material fact as to Wright's possession of probable cause for the arrest.

What of the question as to Wright's objective authority to arrest Nielsen on July 12? Or as the question was put in *Trigg,* 878 F.2d at 1041 and repeated in *Woody,* 55 F.3d at 1268, "was the arresting officer authorized by state and or municipal law to effect a custodial arrest for the particular offense"? Nielsens attempt to challenge Wright's authority in two respects.

■ First, their Mem. 6 suggests that it was illegal for Wright to arrest Nielsen for a misdemeanor that was not committed in his presence. In that respect Nielsens cite *Gramenos,* 797 F.2d at 441 for the common law rule that "an officer may make a custodial arrest for a misdemeanor only if the crime was committed in his presence." That argument is no better than frivolous. Just one paragraph beyond that quoted language, *Gramenos, id.* continues:

> Illinois is among that states that have altered the common law rule. It allows a full custodial arrest for any crime on probable cause. Ill.Rev.Stat. ch. 38 § 107–2(1)(c) [now 725 ILCS 5/107–2(1)(c)].

That statute expressly permits an arrest where the officer "has reasonable grounds" to believe that the person is committing *or has committed* an offense" (emphasis added). Clearly there is no requirement that Wright must have witnessed the crimes personally.

And just as plainly Wright was authorized by Illinois law to arrest Nielsen for mail theft based on reliable eyewitness accounts.

■ Second, Nielsens challenge Wright's authority to arrest Nielsen for a state crime pertaining to the theft of United States mail. Here they point to the Illinois Circuit Court opinion that dismissed criminal charges against Nielsen after finding that "federal [mail theft] statutes have preempted the field" (Nielsens' Ex. 9).

■ Once again their argument falls short. They ignore the relevant statute in terms of examining Wright's authority. As just mentioned, 725 ILCS 5/107–2(1)(c) authorizes Wright to effect a custodial arrest if probable cause existed for considering that Debra had committed "an offense." In that respect the jurisdictional validity of the underlying Illinois theft statute with which Debra was charged (720 ILCS 5/16–1) is relevant only insofar as its proper application to a mail theft charge was one of the "facts and circumstances" known to Wright at the time of the arrest (*Michigan v. DeFillippo,* 443 U.S. 31, 40, 99 S.Ct. 2627, 2633, 61 L.Ed.2d 343 (1979)). In other words, the probable validity of the criminal statute for charging Debra is simply one factor to be evaluated in determining whether Wright had probable cause to arrest.

On that score Nielsens have presented no issue of fact to suggest that Wright should have known that the Illinois theft statute had been preempted by federal mail theft law. Quite to the contrary, the record reflects Wright's reasonable reliance on that facially applicable statute. Postal Inspector Smith had told Wright that the United States Attorney's Office for this Northern District of Illinois would be unlikely to prosecute a claim with a financial value of less than $15,-000 (Smith Dep. 31–33). Smith has further testified that although "the federal government does have control and overriding jurisdiction" in mail theft matters, he believed that "there is nothing to forestall the state from filing on the same charge" (Smith Dep. 133). Indeed, "98, 99 percent" of the investigations Smith performed were "prosecuted

at the state level exactly the same way" as was Debra's arrest and prosecution (*id.*).

Hence Wright had a sound basis for believing that arrest and prosecution of Nielsen for mail theft under 720 ILCS 5/16–1 was perfectly appropriate. As taught in *Ryan v. County of DuPage*, 45 F.3d 1090, 1094 (7th Cir.1995) (citations omitted), where probable cause exists to arrest a defendant for violating an apparently valid statute, a defendant's ultimately successful challenge to that statute does not render the arrest unreasonable:

> If there is probable cause to believe that the defendant has committed a crime by violating some rule, the rule's invalidity, while a defense to a conviction for the crime, is not a ground for his challenging the arrest for violating the rule under the Fourth Amendment, unless the invalidity of the rule was or should have been plain to the arresting officers.

This then concludes the relevant Fourth Amendment analysis as to Wright—and the same conclusion follows a fortiori as to Decker, whose action was based on his own personal observation of Debra. Although defendants have also set forth an argument of qualified immunity (at least with regard to Decker's actions), this opinion has chosen to address directly the underlying existence or nonexistence of a valid Section 1983 claim. That is, instead of examining the affirmative defense of qualified immunity, this Court has first looked at whether a Section 1983 charge was sufficiently established to require resort to such a defense. This path was chosen for two reasons.

First, even if Decker and Wright are able to defend against Debra's Section 1983 claims in qualified immunity terms, that defense is unavailable to Callahan (*Sherman v. Four County Counseling Ctr.*, 987 F.2d 397, 406 (7th Cir.1993) (citation omitted), rejecting any qualified immunity defense for private actors who, although working with state officials, "voluntarily engaged in illegal activities in the advancement of their own self-interest"). On the other hand, this Court's conclusions as a matter of law that Wright and Decker had both probable cause and objective authority to arrest Nielsen are also highly relevant to Callahan's nonliability under Section 1983.

Second, as this Court observed recently in *Morgan v. Stringer*, 945 F.Supp. 1129, 1130–33 (N.D.Ill.1996), this is the type of case in which it does not make much sense to frame the Village officers' position in terms of qualified immunity. It has always been "clearly established law" that the presence or absence of probable cause is a determining factor as to whether an arrest in "unreasonable." Where (as here) a plaintiff claims that an arrest was lacking in probable cause and the officer claims that he or she had such cause, at the current summary judgment stage this Court has necessarily been compelled to address in a fact-intensive matrix the question whether probable cause must be said to exist as a matter of law. Speaking in terms of qualified immunity neither clarifies nor simplifies the analysis.

To return to the earlier-stated substantive rulings, this Court holds as a matter of law that Wright's July 12 arrest of Debra was a "reasonable" Fourth Amendment seizure. Nielsens have identified no issue of material fact to suggest either (1) that Wright lacked probable cause for the arrest or (2) that Wright was not objectively authorized by law to effect the arrest. Hence a summary judgment of dismissal is appropriate on Counts I and II as advanced against Wright and Decker.

*Section 1983 Claim Against Callahan*

As stated earlier, private individuals are subject to suit under Section 1983 if jointly engaged with state officials in a prohibited action (*Vickery*, 100 F.3d at 1343). But this opinion has just held as a matter of law that no "prohibited action" took place. Wright's arrest of Debra was a "reasonable" Fourth Amendment seizure, and Decker's involvement was also insulated against Section 1983 attack. Thus even if Callahan were to be found to have acted "under color" of state law as a result of her dealings with the Village Police Department, Debra's arrest provides no basis for an actionable claim. No Section 1983 action lies where there has been no deprivation of a federal right (*Yang v. Hardin*, 37 F.3d 282, 284 (7th Cir.1994)). Summary judgment is also appropriate on

Debra's Section 1983 claims against Callahan. .

### Count III: Municipal Liability

■ Complaint Count III charges Village with municipal liability under Section 1983 for assertedly violating Debra's same Fourth Amendment right against unreasonable seizure. In the absence of constitutionally violative conduct by Village's decisionmaker (something plainly not present here), any Village liability under Section 1983 must be based on " 'a direct causal link between a municipal policy or custom' and the claimed constitutional deprivation" (*Starzenski v. City of Elkhart*, 87 F.3d 872, 879 (7th Cir. 1996)). Again the earlier ruling that Debra's arrest was reasonable as a matter of law is dispositive of her claim against Village. As *Mark v. Furay*, 769 F.2d 1266, 1271 (7th Cir.1985) (emphasis in original) has made plain:

> The question of whether a municipality caused a constitutional deprivation does not even arise absent proof that a deprivation in fact occurred.

Because Village's police officers violated no federal right in their treatment of Debra, Village itself faces no possible municipal liability for a "policy or custom" leading to their actions. Summary judgment is appropriate as to Count III as well.

### Count V: False Arrest/False Imprisonment under Common Law

■ Complaint Count V ¶ 21 charges defendants under Illinois common law "for their action in their conspiracy for false arrest and imprisonment" of Debra. In that regard *Meerbrey v. Marshall Field & Co.*, 139 Ill.2d 455, 474, 151 Ill.Dec. 560, 569, 564 N.E.2d 1222, 1231 (1990) says:

> The essential elements of a cause of action for false arrest or false imprisonment are that the plaintiff was restrained or arrested by the defendant, and that the defendant acted without having reasonable grounds to believe that an offense was committed by the plaintiff.

So the existence of probable cause for an arrest is also an absolute defense to the state law tort (*Turner v. Green*, 704 F.Supp. 139,

141 (N.D.Ill.1988) and cases cited there; 19 I.L.P. *False Imprisonment* § 4, at 365 (1991)). And that spells summary judgment in defendants' favor as to Count V.

### Count VII: Malicious Prosecution

Although in part Complaint Count VII blurs the distinction between the state law torts of false arrest and malicious prosecution by repeating allegations that attack the circumstances of Debra's arrest, in material part Count VII adds real "malicious prosecution" allegations by charging Wright, Decker and Callahan with having conspired to make false police reports and to sign false criminal complaints. *Kincaid v. Ames Dep't Stores, Inc.*, 283 Ill.App.3d 555, 564, 219 Ill.Dec. 215, 221, 670 N.E.2d 1103, 1109 (1st Dist.1996) has recently recapitulated the elements of an Illinois action for malicious prosecution:

> In order to establish a malicious prosecution action, plaintiff must prove: (1) the commencement or continuation of a legal proceeding by the defendants; (2) the termination of the proceeding in favor of the plaintiff; (3) the absence of probable cause for such proceeding; (4) the presence of malice; and (5) damages resulting to the plaintiff.

■ To be sure, the existence of probable cause for an arrest does not automatically translate into probable cause for the ensuing criminal proceeding (suppose, for example, that exculpatory information were learned after a perfectly proper arrest). But in this instance the selfsame factors that support the probable cause determination as to Debra's arrest apply with equal force to Wright's and Decker's signing of the criminal complaints that triggered Debra's prosecution (even though that prosecution was ultimately unsuccessful). Hence Count VII too succumbs to summary judgment as to Wright and Decker.

■ Debra's malicious prosecution charge against Callahan calls for a different analysis. This opinion has earlier found that no genuine issue of material fact exists as to Wright's reasonable reliance on the reports of Callahan and Joseph (and has thus held that probable cause existed for Debra's ar-

rest as a matter of law), and it has just found that probable cause for Wright's criminal complaint also insulates him from a malicious prosecution action. But no comparable determinations have been made as to Callahan, most specifically as to·the actual veracity of (or motive for) her reports to the Village Police Department. Instead of pursuing that line of inquiry, this opinion will proceed on the arguendo assumption (one that plainly gives Debra the most favorable possible inferences, whether reasonable or not) that Callahan "knowingly gave false information to the· police" (*Denton v. Allstate Ins. Co.*, 152 Ill.App.3d 578, 583, 105 Ill.Dec. 471, 475, 504 N.E.2d 756, 760 (1st Dist.1986)).

⬛ As stated earlier in this section, an essential element of the tort of malicious prosecution is termination of a prior legal proceeding "in favor of" the malicious prosecution plaintiff (*Kincaid*, 283 Ill.App.3d· at 564, 219 Ill.Dec. at 221, 670 N.E.2d at 1109). Indeed, when as here the earlier proceeding is a criminal prosecution, that element is even more exacting (*Swick v. Liautaud*, 169 Ill.2d 504, 512, 215 Ill.Dec. 98, 102, 662 N.E.2d 1238, 1242 (1996)):

> In regard to the second element, a malicious prosecution action cannot be predicated on underlying criminal proceedings which were terminated in a manner not indicative of the *innocence* of the accused.

In those terms the Cook County Circuit Court's disposition of the criminal charges against Debra cannot serve as the predicate for a malicious prosecution charge. Judge Arnold ruled only that federal courts have exclusive jurisdiction over criminal offenses involving the United States mail, not at all that Debra was in any sense "innocent" of the conduct with which she was charged (Nielsens' Ex. 9).[9] As indicated in *Rich v. Baldwin*, 133 Ill.App.3d 712, 719, 88 Ill.Dec. 748, 752, 479 N.E.2d 361, 365 (5th Dist.1985),

a malicious prosecution action will not lie where a criminal charge has been dismissed on "purely technical grounds (as, for example, lack of jurisdiction or defective pleading)."

Like the other defendants then—albeit for different reasons—Callahan is also entitled to a judgment as a matter of law on Count VII. That count is therefore dismissed in its entirety.

### Count VIII: Loss of Consortium by William

⬛ In Complaint Count VIII William claims the loss of companionship, love and affection of his wife due to injuries that Debra suffered from Defendants' actions. "To recover on a loss of consortium claim, the deprived spouse must prove liability on the part of the defendant, marriage to the injured spouse, and damages" (*Johnson v. May*, 223 Ill.App.3d 477, 488, 165 Ill.Dec. 828, 836, 585 N.E.2d 224, 232 (5th Dist. 1992)). Thus William's consortium claim is dependent upon Debra's first establishing a defendant's liability for her claims (21 I.L.P. *Husband & Wife* § 208, at 354 (1977) (footnotes omitted)):

> Although actions for personal injuries and actions for loss of consortium may derive from the same operative facts, they are legally distinct. Nevertheless, while an action for loss of consortium is a separate and distinct cause of action, it is dependent on the liability of the tortfeasor for the spouse's injuries being established.

With each of Debra's claims having failed, William cannot pin his consortium claim to the liability of any defendant. Consequently summary judgment is mandated as to Count VIII as well (*Smith v. Gleason*, 152 Ill.

---

**9.** It cannot be assumed that the *Swick* choice of language—"innocent" rather than "not guilty"—was simply accidental. That distinction has developed increasing significance in the law (though not perhaps among the writers of newspaper headlines). For example, it marks a critical watershed in federal habeas jurisdiction over state court convictions—as *Schlup v. Delo*, 513 U.S. 298, ——, 115 S.Ct. 851, 864, 130 L.Ed.2d 808 (1995) has recently reconfirmed (citing numerous cases), a petitioner's entitlement to call upon the "fundamental miscarriage of justice" exception to the habeas rules of procedural default is "explicitly tied ... to the petitioner's innocence." So it is scarcely surprising to encounter a state law doctrine that similarly ties the existence of a civil claim for malicious prosecution to plaintiff's actual innocence, rather than to the mere dismissal of the criminal proceedings for technical reasons.

App.3d 346, 349, 105 Ill.Dec. 371, 373, 504 N.E.2d 240, 242 (2d Dist.1987)).

*Conclusion*

There is no genuine issue of material fact as to whether Debra's July 12, 1994 arrest was a "reasonable" Fourth Amendment seizure, or as to whether the criminal complaints were supported by probable cause, or as to the inadequacy of the dismissal of Debra's criminal charges to support a malicious prosecution claim. As a result, all of the remaining defendants are entitled to a judgment as a matter of law as to each claim made against any of them. Accordingly all of defendants' motions for summary judgment are granted and this action is dismissed.