KENNETH JOHNSON et al., Plaintiffs-Appellants, v. JAMES MAY et al., Defendants-Appellees.

Fifth District   No. 5—90—0401

Opinion filed January 10, 1992.

478

Gordon Lambert, of Harris & Lambert, of Marion, for appellants.

Hinshaw & Culbertson, of Chicago (Stephen R. Swofford, Dennis J. Graber, and Gary J. Bazydlo, of counsel), for appellees.

JUSTICE HARRISON delivered the opinion of the court:

Plaintiff Kenneth Randall Johnson (Randy) brought an action in the circuit court of Franklin County to recover damages for personal injuries he sustained when his tractor-trailer was hit at an intersection by a truck which had failed to yield the right-of-way to him in violation of section 11—904(b) of the Illinois Vehicle Code (Ill. Rev. Stat. 1987, ch. 95½, par. 11—904(b)). In the same action, plaintiff Linda Johnson, Randy's wife, asserted a claim for loss of consortium. Named as defendants were James May, the driver of the second truck, and Shapiro Brothers of Illinois, Inc., the second truck's owner. Following a jury trial, a verdict was returned in favor of Randy. He was found to have sustained $43,609.60 in damages, but the jury concluded that he was 50% contributorily negligent. It therefore reduced his recovery to $21,804.80. Linda received nothing. On her claim, the jury found for defendants. The circuit court entered judgment on the

jury's verdicts and denied plaintiffs' post-trial motion. Plaintiffs now appeal. We affirm in part and reverse and remand in part.

Plaintiff Randy Johnson was a professional truck driver. The record before us established that on the morning of December 21, 1987, he was driving a tractor-trailer loaded with coal along Illinois Route 154 near the town of Sesser. Route 154 is a two-lane, undivided highway. Each lane is 12 feet wide. At the location relevant here, the highway runs east to west. It is intersected by County Road 800E, which cuts across it from north to south at a 90-degree angle. At the intersection between these two roads, County Road 800E is marked by stop signs. Route 154 is not. This means that Route 154 is the preferential highway, and drivers approaching it from County Road 800E have a statutory duty to stop and to "yield the right-of-way to any vehicle which has entered the intersection from [the other] roadway or which is approaching so closely on the roadway as to constitute an immediate hazard during the time when the driver is moving across or within the intersection." Ill. Rev. Stat. 1987, ch. 95½, par. 11—904(b).

Randy approached the intersection with County Road 800E from the west, traveling at a speed of between 50 and 55 miles per hour, which was within the legal limit. As Randy's tractor-trailer entered the intersection, it was struck by a truck driven by defendant James May, who had been proceeding north along County Road 800E. The initial point of contact between the two vehicles was at the left front fender of May's truck and the right front fender of Randy's tractor-trailer. An accident-reconstruction expert testified that Randy's truck was astride the center line of Route 154 when it was hit. He believed that May had run the stop sign and that the vehicles had hit where they did because Randy had swerved at the last second to avoid the crash. This scenario found corroboration in the testimony of plaintiff Linda Johnson, who reported hearing May admit to his wife that he had run the stop sign.

May's version of the events leading to the collision was somewhat different. He testified that he did stop at the stop sign before proceeding into the intersection and denied ever having said otherwise. What he did not deny is that he failed to yield the right-of-way to Randy's tractor-trailer, as he was obligated to do. Evidently, the reason he did not yield the right-of-way was simply because he did not see Randy coming. Why he did not see him was never explained, for May claimed that he did not remember the accident. May admitted, however, that it was a clear day, that there were no obstructions to his vision, and that he was completely familiar with the road.

The force of the collision was so severe that Randy's rig was totally demolished. Randy was pinned under the debris, facedown, for over an hour and a half. Firefighters were unable to cut him free using the "jaws of life," and he was extricated only after a crane was brought from a nearby mine to lift the wreckage off of him. From the crash site, Randy was taken to the hospital, where he remained for five days. An otolaryngologist who treated him in the emergency room testified that Randy had a laceration in his right eyelid, two lacerations on his forehead, abrasions on the left side of his temple, a laceration on his scalp, a cut lip, and a broken nose. The doctor sutured the lacerations on Randy's face and lip and straightened his nose. The various cuts healed properly, although Randy was left with some permanent scars. Randy continued to have a problem with a deviated septum, and the otolaryngologist recommended corrective surgery. By the time of the trial, however, Randy had not yet had this done.

Randy was also treated by an orthopaedic surgeon, who initially diagnosed plaintiff as having a fracture of the right humerus, which is the long bone which extends from the shoulder to the elbow. The same orthopaedic surgeon saw Randy again approximately one month after the accident, when he complained of having impaired motion in his right shoulder. Upon further examination, the surgeon discovered that Randy also was suffering from a fracture to his shoulder blade. There was no dispute that this injury was also caused by the accident.

While none of Randy's physical injuries was particularly grave, he continued to complain of persistent pain throughout his body. At the same time, friends, family members and associates testified that he was completely changed by the accident. Where previously he had been very active and hard working, he was now listless and seemed always to be in pain and discomfort. He walked and talked slowly. He became short-tempered and combative. He ceased being the affectionate and caring person he once was. He was no longer able to perform even relatively simple household maintenance tasks. Most of his time was spent lying on the couch or in bed. His physical relationship with his wife ended, and they no longer had sexual relations.

In the months and years that followed, Randy sought treatment from a succession of doctors in an attempt to alleviate his suffering. One of the first of these was Dr. Larry Jones, a family practitioner. Jones recommended physical therapy for Randy's shoulder and sent him to a neurologist named Dr. Modali, who reported that Randy had no objective abnormalities. Jones continued to see Randy in early 1988, but his complaints did not abate. Jones' diagnosis was that, as a

result of the accident, Randy was suffering from posttraumatic stress disorder, a psychiatric disorder which afflicts some people after they have suffered a traumatic experience outside the realm of normal human experience, such as an accident or explosion. Jones testified that Randy actually had one of the worst cases of the disorder that he had ever seen. According to Jones, the disorder was so severe that Randy was totally disabled. Jones prescribed antidepressants and pain medication and referred him to a psychologist named Dr. Gordon Plumb.

Plumb, a licensed clinical psychologist, first saw Randy on March 7, 1988. He took Randy's history, evaluated his symptoms, and administered the Minnesota Multiphasic Personality Inventory Test to him. Based upon the test results, the history, and the symptoms he observed, Plumb confirmed Jones' diagnosis that Randy was suffering from posttraumatic stress disorder as a result of the accident. According to Plumb, it was a "very severe case," "the most severe case *** I have seen."

Plumb subsequently had approximately three dozen sessions with Randy. He testified that Randy's condition was not necessarily permanent but that it was extremely unlikely that he would ever return to any occupation involving driving trucks or cars. In fact, he opined that Randy was permanently disabled from returning to work as a truck driver. In his view, Randy would require weekly sessions with him for one to two years in the future. However, he also recommended that Randy participate in a pain clinic on an inpatient basis. In his view, a successful stay at a pain clinic could reduce the course of Randy's psychological treatment by six months to a year.

In addition to sending Randy to Dr. Plumb, Dr. Jones also referred him to Dr. Philip Hurley, an orthopaedic surgeon. As he had with the other doctors, Randy presented himself to Dr. Hurley complaining of pervasive pain. He also reported having the shakes, being afraid of driving, being irritable, and having muscle twitches. Hurley's examination disclosed the fractures in Randy's humerus and collar bone. He also discovered the scar tissue caused by the fractures and evidence of early reflex sympathetic distrophy. He subsequently found that Randy had some mechanical low-back pain. In Hurley's opinion, however, Randy's most serious problem was his extreme emotional anxiety, and he told Randy that he could not do more to help him until he got help with those problems. As had Plumb, Hurley recommended that Randy receive inpatient treatment at a pain clinic. He prescribed anti-inflammatory and antianxiety medications. Hurley shared the other doctors' view that Randy was disabled and that he could never return to work as a truck driver, although he added that

with treatment Randy would probably improve enough so that he would be able to "return to some source of labor."

A year after he first saw Dr. Jones, Randy also sought treatment from another family physician whose name was Dr. Ewell. Ewell diagnosed Randy as having a chronic back sprain, which was caused by the accident. In his view, the back sprain would eventually resolve to the point that it would not impair normal activities. Ewell also diagnosed Randy as suffering from depression and posttraumatic stress disorder. The posttraumatic stress disorder, in Ewell's view, was Randy's most serious problem. He opined that it would require extensive psychiatric therapy, including a minimum of four to six weeks of inpatient treatment and outpatient treatment for a couple of years after that. Ewell testified that Randy was disabled to work and that without proper care he might never be able to rejoin the work force. He stated that with proper treatment, Randy might be able to do something with himself, although he would be surprised if he ever drove a tractor-trailer again. He told the jury that Randy's marital and family problems were related to the accident, and that his posttraumatic stress disorder was caused by the accident.

Dr. Ewell referred Randy to Dr. Ronald Kelley, a psychiatrist. Kelley first saw Randy on May 26, 1989. This initial visit was followed by four subsequent treatment sessions in June, July and August of 1989. Based on these sessions, Dr. Kelley also diagnosed Randy as suffering from posttraumatic stress disorder. Kelley confirmed that posttraumatic stress disorder is a recognized psychiatric disorder according to the American Psychiatric Association, and he noted research which showed that vehicular accidents, such as the one Randy was involved in, are probably the most common peacetime causes of the disorder.

Kelley felt that Randy was suffering from a chronic and severe form of the disorder and that he also had a depressive disorder. He placed Randy on medication, including, in succession, Prosac and Buspar, and he recommended that Randy receive at least three months of inpatient psychiatric treatment. Kelley believed that after such treatment, Randy would need additional outpatient care, including monthly medication checks and weekly psychotherapy sessions, for "anywhere from one to three years." Kelley opined that with such treatment, Randy's prognosis would improve and that there was a 50% probability that he would be able to return to some kind of job, provided that it was routine and not stressful. In his view, however, Randy would never be able to drive a truck again professionally.

In the year leading up to the accident, Randy earned approximately $23,000. After the accident, and up to the time of the trial, which was held in January of 1990, he had not been able to return to any kind of work. His total medical bills already amounted to over $14,000, and the evidence showed that his future medical expenses could be substantially greater. Dr. Kelley testified, for example, that if Randy were to undergo the inpatient psychiatric treatment he recommended, the cost would be up to $1,000 per day, seven days a week, for the prescribed three-month period. This alone would amount to over $90,000.

Following the close of the evidence, the jury returned a verdict in favor of Randy, but found that he had sustained a total of only $43,609.60 in damages. It itemized these damages as $0 for disability, $2,000 for disfigurement, $10,000 for pain and suffering, $8,609.60 for past and future medical care, and $23,000 for lost earnings. The jury further determined that Randy was 50% contributorily negligent and therefore reduced his recoverable damages by half, to $21,804.80. The jury returned a verdict against Linda Johnson and in favor of defendants on her loss of consortium claim. Judgment was entered on the verdict, and plaintiffs' posttrial motion for judgment notwithstanding the verdict or, in the alternative, a new trial was denied. Plaintiffs now appeal.

■ On this appeal, plaintiffs first argue that the circuit court erred in denying their motion for judgment notwithstanding the verdict on the issue of Randy's contributory negligence. Judgments notwithstanding the verdict, as with directed verdicts, should be entered only in those cases where all the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors the moving party that no contrary verdict based on that evidence could ever stand. (*Ward v. K mart Corp.* (1990), 136 Ill. 2d 132, 139-40, 554 N.E.2d 223, 226.) With respect to the issue of contributory negligence, we believe that standard has been met here.

May does not deny that he failed to yield the right-of-way to Randy as required by section 11—904(b) of the Illinois Vehicle Code (Ill. Rev. Stat. 1987, ch. 95½, par. 11—904(b)). As indicated at the outset of this opinion, that statute specifically provides that the driver of a vehicle approaching a stop at an intersection indicated by a stop sign is obligated to stop and, after having stopped, to "yield the right-of-way to any vehicle which has entered the intersection from another roadway or which is approaching so closely on the roadway as to constitute an immediate hazard during the time when the driver is moving across or within the intersection." (Ill. Rev. Stat. 1987, ch. 95½,

par. 11—904(b).) There were no facts to palliate May's negligence in failing to do this. He simply was not paying attention to what he was doing. By his own admission, he did not even see Randy before pulling out in front of him.

At trial May nevertheless claimed that Randy should share a substantial share of the responsibility for the accident because he was not keeping a proper lookout either. We agree that Randy did not have an absolute right to drive into the intersection at will. Even though the driver on a preferential road has the right-of-way, he may not proceed into obvious danger. (*Thomas v. Lynch* (1978), 59 Ill. App. 3d 542, 545, 375 N.E.2d 859, 861.) Rather, he has a duty to keep a proper lookout, observe due care in approaching and crossing intersections, and drive as a prudent person would to avoid a collision when danger is discovered or, by the exercise of reasonable care, should have been discovered. (*Salo v. Singhurse* (1989), 181 Ill. App. 3d 641, 643, 537 N.E.2d 339, 341.) We fail to see, however, how Randy could possibly be found to have breached this duty.

As he approached the intersection with County Road 800E, a secondary road controlled by a stop sign, Randy had the right to expect that May, who was approaching along that road, would obey the stop sign and yield the right-of-way. (See *Thomas v. Lynch* (1978), 59 Ill. App. 3d 542, 545, 375 N.E.2d 859, 861.) Under his own version of the facts, May did, in fact, stop at that stop sign. Accordingly, even if he had been more vigilant, Randy would have had no possible reason to believe that any danger existed until May moved forward again and into the intersection. By that time, however, there was nothing that Randy could reasonably have done to avert the collision.

Although there was no direct evidence as to May's speed, the reconstruction expert testified that he was probably traveling five miles per hour or less at the time he hit Randy's vehicle. This means that from the time May began to move forward from the stop sign until the time he spanned the 12-foot or so distance to the center of Route 154 where the collision took place, less than three seconds elapsed. At the beginning of that brief interval, Randy was less than 242 feet away from the point of impact. We infer this based on the speed he was traveling, which the undisputed evidence showed to be not more than 55 miles per hour, a rate equivalent to 80.67 feet per second. Given that the reaction time necessary to stop a motor vehicle is at least a second (*Seeds v. Chicago Transit Authority* (1950), 342 Ill. App. 303, 306-07, 96 N.E.2d 646, 648, *appeal dismissed in part, judgment rev'd in part on other grounds* (1951), 409 Ill. 566, 101 N.E.2d 84), Randy would thus have been left with less than 162 feet in which

to stop after May began to pull forward into the intersection. It requires no special expertise to realize that a tractor-trailer loaded with coal, traveling at or near 55 miles per hour, is incapable of being stopped in so short a distance. Accordingly, even if Randy had kept a better lookout, the collision would still have taken place.

We are mindful the great deference we must accord to a jury's determination of comparative negligence. (See *Rainey v. City of Salem* (1991), 209 Ill. App. 3d 898, 905, 568 N.E.2d 463, 468.) That deference, however, should not be regarded as an invitation to abandon reason. Even when all of the evidence is viewed in the light most favorable to defendants, the prevailing parties, there is no way Randy could rationally be regarded as having contributed in any way to the accident. The sole cause for that accident was May's negligence. (See *Salo v. Singhurse* (1989), 181 Ill. App. 3d 641, 643-44, 537 N.E.2d 339, 341.) We therefore reverse the judgment to the extent that it apportioned 50% of the fault to Randy. May's fault is 100%. Randy's is 0%.

■ Randy next asks that we set aside the jury's damage award. It is axiomatic that a jury's finding of damages will not be overturned unless the damages are manifestly inadequate, proven elements of damages were ignored, or the amount awarded bears no reasonable relationship to the loss suffered. (*Zitzmann v. Miller* (1990), 194 Ill. App. 3d 477, 482, 551 N.E.2d 707, 710.) This is such a case. As we have indicated, the jury awarded Randy nothing for disability, only one years' worth of lost wages, and a sum for medical expenses that was not only inadequate to cover his future medical bills but was insufficient even to meet the medical costs he had already incurred. The only explanation for this result is that the jury agreed with what ultimately became defendants' primary defense, namely, that plaintiff was not suffering from any legitimate psychiatric disorder but was, in fact, faking. This conclusion cannot be sustained by the evidence in the record before us.

As our summary of that record indicated, the medical and psychiatric testimony overwhelmingly established that Randy was suffering from a debilitating case of posttraumatic stress disorder. Defendants adduced no psychiatric or psychological testimony to the contrary. The only medical evidence of any kind which they presented was the testimony of a neurologist named William Landau. Landau was retained to examine Randy by the insurance carrier for Randy's employer. He saw Randy only once and then for only an hour and 15 minutes. Landau was evidently so hurried or so inattentive during this brief meeting that he did not even observe accurately which hand Randy wrote

with. His notes specifically indicate that Randy is right-handed, when there is no dispute that he is in fact left-handed.

Based upon his brief examination, Landau could "find no possible explanation involving disturbance, structure damage, or functioning of the nervous system" and could see no way of accounting for Randy's symptoms and behavior "except to consider that this whole picture represented a concept of malingering." Landau completely discounted the possibility that posttraumatic stress disorder could be to blame. Indeed, he testified at his deposition that he did not believe that such a thing as posttraumatic stress disorder even existed as a valid medical diagnosis. According to Landau, it simply "define[d] a syndrome of malingering, but is a fancy name therefor." By malingering, he meant "faking," and he stated that in his view, there was no legitimate basis for the disorder and that it was not supported by any scientific evidence that he personally knew of.

Following the testimony given by Randy's experts at trial, Landau attempted to qualify this position somewhat. In the end, however, it was evident that the primary reason Landau regarded Randy as a faker was because Landau harbored a personal philosophical belief that posttraumatic stress disorder was a faker's claim. Landau took this position notwithstanding the American Psychiatric Association and the overwhelming weight of medical authority and notwithstanding the fact that, by his own admission, he had never even personally treated a patient who had been diagnosed as suffering from the condition. He was, after all, a neurologist, not a psychologist. He explained that "[s]uch patients don't come to neurologists ***. They go to psychiatrists who treat the psychological reactions."

Landau's condemnation of posttraumatic stress disorder was the cornerstone of the defense's "malingerer" theory. In our view, however, the validity of the disorder is not something which is open to serious question, at least not on this record. Posttraumatic stress disorder has been recognized by the courts of this State in a variety of contexts, including criminal cases (see *People v. Wasson* (1991), 211 Ill. App. 3d 264, 270, 569 N.E.2d 1321, 1326), workers' compensation claims (see *May v. Industrial Comm'n* (1990), 195 Ill. App. 3d 468, 487, 552 N.E.2d 258, 270-71), and personal injury actions (see *De-Young v. Alpha Construction Co.* (1989), 186 Ill. App. 3d 758, 766, 542 N.E.2d 859, 864). Dr. Landau's position, by contrast, appears to be entirely idiosyncratic. At least we have found nothing in the case law and there is nothing in the medical testimony here to corroborate it.

Lacking any expert support for Landau's position, defendants adduced various other types of evidence which was supposed to show that Randy had, in fact, been faking as Landau had charged. For example, defendants' counsel elicited from Linda Johnson that Randy had a close cousin afflicted with posttraumatic stress disorder who had lived with them on and off for some period of time. That cousin had committed suicide a year to a year and a half prior to Randy's accident. This tragedy was brought out not to establish some family predisposition toward the disorder. Its function, evidently, was to indicate to the jury that Randy had some prior exposure to the disease and, thus, an opportunity to learn to emulate its symptoms.

Defendants also called Gene Fox, one of Randy's former employers, who testified that he had once had to fire Randy because Randy would not do the work he was being paid for but would, instead, have his sons do the work for him. Fox also testified that he observed Randy drive a tractor-trailer cab since the accident. On rebuttal, however, Randy called various witnesses who revealed that Fox was actually a disgruntled neighbor of the plaintiffs who had feuded with Randy over the water supply to their respective properties. These witnesses also categorically denied Fox's claim that Randy had driven a tractor-trailer cab after the accident.

Defendants' biggest stratagem was their use of a so-called "legal investigator and claims adjuster" whom they hired to spy on Randy. The investigator testified that on December 6, 1989, he observed Randy driving his car and laughing with his wife. He followed them to their home, where he observed Randy walk into the house. From a hiding spot several hundred feet away, the investigator took photos of Randy as he walked along, and these were explained in some detail to the jury. Several days later the investigator also trailed Randy as he visited his psychologist, Dr. Plumb. This time the investigator made a video recording of Randy which showed, among other things, Randy driving, walking some more, and putting on his jacket.

This presentation gave the clear impression that some deep secrets were being revealed. Such, however, was not the case. Although Randy's evidence was that he was constantly in pain and out of sorts, no claim was made that he never laughed or was incapable of moving his arms enough to put on a jacket. About his walk, the photographs themselves reveal nothing. In them he appears as little more than a small spot in the middle of the frame. In the video, where you can see him walk, his gait is plainly slowed and pained, which is entirely consistent with his testimony and that of his doctors. Moreover, although Linda Johnson once suggested otherwise at a deposition, the plaintiffs

freely admitted that Randy did drive a car on occasion. He never claimed that he could not, and his doctors never claimed that he could not. What the evidence did show is that since the accident, Randy drove badly and unsafely. His wife recalled one incident in particular when Randy's attention failed as he was driving down a country road. He veered to the right and nearly crashed into a 15- to 20-foot ravine.

Taken as a whole, what the record in this case makes manifestly clear is that Randy had been hardworking, industrious, and active his entire life. He is now sedentary and lethargic, unable even to do household repairs which would have been routine for him previously. The expert medical and psychiatric evidence overwhelmingly established that this was the result of Randy's acute posttraumatic stress disorder, and that the disorder is a legitimate psychiatric condition. The reported case law shows that persons afflicted with posttraumatic stress disorder arising from accidents comparable in severity to Randy's have received as much as a half a million dollars in noneconomic damages from the negligent party. While the magnitude of that award is scarcely controlling in other cases, we think that it is at least some indicia of just how far off the mark the jury's verdict was in this case. The verdict is contrary to the weight of the evidence, and Randy is entitled to a new trial on the issue of damages. Randy has raised various subsidiary arguments, but in light of this disposition, we need not address them.

Linda Johnson, for her part, contends that we must likewise set aside the jury's verdict on count II, which found for defendants on her claim for loss of consortium. We agree. When one spouse is injured by the negligence of another, the other spouse may recover from the tortfeasor for the loss which the deprived spouse suffered by virtue of the impaired spouse's injury. (*Malfeo v. Larson* (1990), 208 Ill. App. 3d 418, 425, 567 N.E.2d 364, 369.) Actions such as this for loss of consortium are based upon a transferred-negligence theory whereby the defendant's duty to act with reasonable care toward the impaired spouse is transferred to the deprived spouse. A loss of consortium claim incorporates two basic elements of the marital relationship: (1) loss of support and (2) loss of society, which includes companionship and sexual intercourse. *Casey v. Pohlman* (1990), 198 Ill. App. 3d 503, 509, 555 N.E.2d 1221, 1225.

To recover on a loss of consortium claim, the deprived spouse must prove liability on the part of the defendant, marriage to the injured spouse, and damages. (*Seaman v. Wallace* (1990), 204 Ill. App. 3d 619, 639, 561 N.E.2d 1324, 1338.) In this case, there is no dispute that the evidence established that defendants were liable and that

Linda Johnson was married to Randy at the time of his injury. The evidence also overwhelmingly established that Linda Johnson sustained the type of injuries cognizable in an action for loss of consortium. Linda and Randy had previously had a happy marriage. Randy was affectionate and considerate, he helped around the house, and the two had an active sex life. Now he is combative and disagreeable. In Linda's words, "It's been a living hell ***." At one point she entertained thoughts of leaving him. They have ceased having sexual intercourse, and Randy makes no contribution to the maintenance or upkeep of the household.

■■ In view of this evidence, the only explanation for the jury's verdict is that it believed that whatever suffering Linda endured was simply the result of symptoms which were feigned by Randy. As we have previously indicated, however, the evidence overwhelmingly showed that Randy was not faking and that his disorder was a legitimate one. Accordingly, just as he is entitled to a new trial as to his damages, Linda is entitled to a new trial on her loss of consortium claim.

For the foregoing reasons, the judgment of the circuit court of Franklin County is affirmed insofar as it found defendants liable on count I of plaintiffs' complaint. The judgment is reversed insofar as it found Randy 50% contributorily negligent, and we direct that his contributory negligence be reduced to zero. We further reverse the circuit court's damage award to Randy and remand the cause for a new trial on the issue of Randy's damages. We also reverse the judgment against Linda Johnson on count II, her loss of consortium claim, and remand for a new trial on that claim.

Affirmed in part; reversed and remanded in part with directions.

WELCH and LEWIS, JJ., concur.