# Illinois Official Reports

## Appellate Court

---

### *In re Estate of Case*, 2016 IL App (2d) 151147

---

| | |
|---|---|
| Appellate Court Caption | *In re* ESTATE OF BARBARA A. CASE, Deceased (Jamie M. Myers, as Administrator of the Estate and Personal Representative of Barbara A. Case, Deceased, Plaintiff-Appellant, v. Johnny R. Hanneman, Alan Gorzlancyk Enterprises, Inc., and JMB Express, LLC, Defendants-Appellees). |
| District & No. | Second District<br>Docket No. 2-15-1147 |
| Filed | August 2, 2016 |
| Decision Under Review | Appeal from the Circuit Court of Winnebago County, No. 13-L-351; the Hon. Eugene G. Doherty, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | William T. Cacciatore and Eileen J. McCabe, both of Cacciatore Law Offices, of Rockford, for appellant.<br><br>J. Daniel Porter and Stacy K. Shelly, both of Langhenry, Gillen, Lundquist & Johnson, LLC, of Rockford, for appellees. |
| Panel | JUSTICE BIRKETT delivered the judgment of the court, with opinion.<br>Justices Hutchinson and Burke concurred in the judgment and opinion. |

**OPINION**

¶ 1    Plaintiff, Jamie M. Myers, as administrator of the estate and personal representative of the deceased, Barbara A. Case, appeals the judgment of the circuit court of Winnebago County granting summary judgment in favor of defendants, Johnny Hanneman, Alan Gorzlancyk Enterprises, Inc. (Gorzlancyk), and JMB Express, LLC (JMB), on the ground that plaintiff had not presented any evidence of Hanneman's negligence in operating the semitractor and trailer combination that collided with Case's vehicle. On appeal, plaintiff argues that there was a genuine issue of material fact as to whether Hanneman was negligent. We affirm.

¶ 2                                   I. BACKGROUND

¶ 3    We begin by summarizing the pertinent undisputed facts in the record. Illinois Route 2 is a north-south highway. At the intersection with Roscoe Road, Route 2 is a two-lane road, with one northbound lane and one southbound lane. Route 2 has a 55-mile-per-hour speed limit around the Roscoe Road intersection. About 500 feet north of the intersection, the roadway dips and then rises. Likewise, about 600 feet south of the intersection, the roadway again dips and rises. For the approximately 1100 feet near the intersection, the roadway is flat and level, and, on a clear day, vehicles would be visible throughout that distance. Farther north, perhaps a mile, southbound Route 2 narrows from two lanes to one. Finally, Roscoe Road, both eastbound and westbound, has stop signs at the intersection with Route 2; Route 2 is unimpeded and deemed the preferential road at the intersection.

¶ 4    On December 6, 2011, the weather was overcast but otherwise clear. The roadway was dry, and there were no weather or atmospheric conditions interfering with a driver's visibility around the intersection of Route 2 and Roscoe Road.

¶ 5    Also on December 6, 2011, Hanneman was driving a tractor-trailer for his employer, Gorzlancyk. The truck appears to have been owned by JMB and leased to Gorzlancyk. Gorzlancyk was in the business of recycling, refurbishing, and producing wood pallets. Hanneman had worked for Gorzlancyk for about 23 years, and he had driven trucks for Gorzlancyk for about 20 years. During the 10 years preceding the accident, Hanneman had driven along northbound Route 2 many times, and he estimated that he used the road as frequently as five times in a month. On that day, Hanneman had picked up a load of broken pallets from the Carson Pirie Scott Distribution Center in Rockford, and he was transporting the load to Gorzlancyk in Plover, Wisconsin.

¶ 6    Terry Gross, a vice president with Gorzlancyk, testified in his deposition that the empty tractor-trailer that Hanneman was driving weighed about 35,000 pounds. Gross testified that Hanneman received a full load of 500 broken pallets from the Carson's distribution center. Gross estimated that each pallet weighed about 25 pounds. Gross also estimated that the loaded tractor-trailer weighed about 60,000 pounds, well below its maximum weight of 80,000 pounds. Hanneman testified that, when his tractor-trailer was carrying a load, it would take him about 500 feet to come to a controlled stop from a speed of 55 miles per hour.

¶ 7    At about 11:52 a.m., on December 6, 2011, Hanneman was driving the tractor-trailer north on Route 2, approaching the intersection with Roscoe Road. He testified in his deposition that he had been traveling on Route 2 for about 30 minutes when he approached the intersection. Hanneman testified that his truck was limited by a governor to a maximum speed of 67 miles

- 2 -

per hour. Hanneman testified that, at the relevant times, he was traveling at 55 miles per hour and was maintaining that speed as he approached the intersection. Hanneman testified that he had been behind a white van for some time. As he approached the intersection, the white van went into the dip to the north of Roscoe Road, and Hanneman lost sight of it. Hanneman specifically testified that, although the intersection is at the crest of a rise—with dips both to the north and the south of the intersection—he could see the entire roadway as he approached the intersection from the south.

¶ 8 Hanneman testified that he was about to enter the intersection of Route 2 and Roscoe Road when he first saw Case attempting to turn left in front of him. Hanneman estimated that he might have been less than 50 feet from the intersection when he saw Case's Dodge Stratus entering the intersection from the north to make a left turn and proceed east on Roscoe Road. Hanneman testified that he slammed on his brakes and turned slightly to the right. The front of Hanneman's truck struck the passenger side of Case's vehicle. Upon the impact, the two vehicles became stuck together. Hanneman's truck continued off the roadway, pushing Case's vehicle in front of it. The two vehicles proceeded through a bordering ditch and into an adjacent cornfield to the northeast of the intersection.

¶ 9 Hanneman testified that Case did not enter Roscoe Road before the collision. He also testified that the collision took place entirely within the northbound lane of Route 2. Hanneman further testified that his truck never entered the southbound lane of Route 2; rather he consciously made the choice to steer to the right when he saw Case's vehicle entering his lane. Finally, Hanneman testified that he did not believe that there was anything he could have done to avoid the collision.

¶ 10 Deputy Michael Pearson of the Winnebago County sheriff's police testified that he was the department's accident reconstructionist. He observed a tire yaw mark laid down by Case's vehicle as it turned to the left. Pearson testified that Case took the turn too quickly and abruptly, causing so much stress on the tire that the sidewall marked the pavement. Pearson also recorded about 55 feet of precollision marks left by Hanneman's truck. Finally, Pearson determined that the truck and the car came to rest in the cornfield some 200 feet from the impact on the roadway.

¶ 11 Two witnesses who had been behind Case at the moment of the collision also testified. Donna Zarabia testified that she was driving her daughter, Jazmin Sarabia, to court. Sarabia had to resolve a traffic ticket that she received for having too many people in the car when she was a new driver. Zarabia testified that she was driving in the inner, or left, lane of southbound Route 2. As she approached the narrowing of Route 2 into single lanes, Case passed her on the right, in the outer southbound lane, before the lane disappeared. Zarabia remarked to Sarabia that Case was driving and passing too fast. Zarabia was trying to make a point to her daughter about younger drivers. Sarabia observed that Case was approximately Zarabia's age. Zarabia testified that this surprised her, because she associated Case's excessive speed with a younger driver. Zarabia also admitted that she was driving at about 60 miles per hour as she approached the point where Route 2 narrowed.

¶ 12 Zarabia testified that, after Case passed her, she maintained a constant distance behind Case. As they approached the intersection, Zarabia knew that Case was going to turn left, even though she did not recall seeing Case's brake or signal lights. Zarabia testified that Case's vehicle did not come to a stop before beginning the turn. As the vehicle began the turn, Zarabia became aware of Hanneman's truck. As soon as she registered the truck, the two vehicles

collided. Zarabia noted that she heard squealing tires from the truck for a couple of seconds before the collision. Zarabia testified that she was driving past the two vehicles as they hit gravel, presumably on the shoulder of the roadway, and that Case's car sprayed gravel onto Zarabia's car as Zarabia passed the scene.

¶ 13 Zarabia testified that she immediately pulled to the side of the road and that she and her daughter exited and proceeded to the site of the accident. Zarabia testified that she approached Hanneman to see if he was injured. Hanneman said that Case's car had pulled in front of him, and Zarabia comforted Hanneman, telling him that she had seen what had happened.

¶ 14 Sarabia testified that, on December 6, 2011, shortly before noon, she was riding in the passenger seat of Zarabia's car as they were going to the courthouse in Rockford to resolve a traffic ticket. Sarabia repeated some of the facts about Route 2 that Zarabia had testified about. Sarabia noted that, about a mile north of the intersection, where Route 2 narrows, Case's car passed theirs on the inside lane. Sarabia observed that Case was around her mother's age. She recalled this because Zarabia started to hold forth about younger drivers until Sarabia pointed out that Case was actually an older driver. Case stayed in front of them as they approached the intersection of Route 2 and Roscoe Road.

¶ 15 Sarabia testified that, as they approached the intersection, she observed Case's brake lights go on for "like a second" and then go off. When Case's vehicle was very close to the intersection, Sarabia observed the left turn signal flash once or twice. Case did not come to a stop; instead, she slowed and began to turn left. Sarabia testified that, as soon as Case crossed the centerline of the roadway to begin her turn, she was immediately struck by Hanneman's truck.

¶ 16 Both Zarabia and Sarabia testified that they could not estimate the speed of Hanneman's truck. Both testified, however, that Hanneman appeared to appropriately operate his vehicle as he approached the intersection. Sarabia testified that, while she did not see Hanneman's truck until Case began her turn, her view of the truck as it approached the intersection was unobstructed.

¶ 17 Additionally, Sarabia testified that she did not believe that there was any way that Hanneman could have avoided the collision. Both Zarabia and Sarabia testified that, had Case not turned in front of Hanneman, there would not have been a collision.

¶ 18 On November 26, 2013, plaintiff, acting as the administrator of Case's estate and as Case's personal representative, filed suit against defendants: counts I and II alleged vicarious liability against Gorzlancyk and JMB for Hanneman's actions, and counts III and IV alleged negligence against Hanneman. Defendants moved to dismiss counts I and II, which the trial court granted without prejudice. On January 29, 2014, plaintiff filed an amended complaint. Counts I and II alleged wrongful death and survival actions, respectively, against Gorzlancyk under the theory of *respondeat superior*; counts III and IV alleged wrongful death and survival actions, respectively, against Hanneman; and counts V and VI alleged wrongful death and survival actions, respectively, against JMB under the theory of *respondeat superior*. On January 12, 2015, defendants filed a motion for summary judgment on each of the survival counts. On April 9, 2015, the trial court held that the uncontradicted medical testimony showed that Case was rendered immediately unconscious by her injuries. The affirmative evidence offered by plaintiff was, at best, speculative as to Case's conscious pain and suffering, and the trial court granted summary judgment in favor of defendants on counts II, IV, and VI of the amended complaint.

¶ 19 On June 24, 2015, pursuant to Illinois Supreme Court Rule 213(f)(3) (eff. Jan. 1, 2007), plaintiff disclosed D.G. Owen as an expert witness regarding accident reconstruction. Plaintiff represents that Owen would opine that Hanneman was driving at an excessive rate of speed for the conditions and that Hanneman failed to reduce his speed as he approached the intersection of Route 2 and Roscoe Road.

¶ 20 On July 23, 2015, plaintiff filed a second amended complaint, with counts I, III, and V alleging wrongful death actions against defendants (using the theory of *respondeat superior* against Gorzlancyk and JMB) and with counts II, IV, and VI realleging survival actions against defendants (in order to preserve any appealable issues). Defendants' answer included the affirmative defense of Case's contributory negligence.

¶ 21 On July 29, 2015, defendants filed a motion for summary judgment on all counts of the second amended complaint. The trial court held, alternatively, that there was no evidence "from which a jury might be able to find negligence on the part of Hanneman"; that "the facts show that Case suddenly and without warning swerved into the oncoming lane of traffic, so the accident was unavoidable" and Hanneman's conduct, "even if [he] were proceeding some slight amount over the speed limit, *** could not be considered the legal cause of the accident"; and that "the facts adduced by the parties *** could not support a jury finding of 50% of the fault being attributable to Hanneman." The court thus granted summary judgment in favor of defendants. Plaintiff timely appeals.

¶ 22 II. ANALYSIS

¶ 23 On appeal, plaintiff challenges each of the alternative bases of the trial court's grant of summary judgment in favor of defendants. Plaintiff argues first that the trial court erred in determining that there was no evidence from which a jury could determine that Hanneman had been negligent. Second, plaintiff argues that the trial court erred in determining that any of Hanneman's conduct was not a proximate cause of the collision. Finally, plaintiff contends that the trial court erred in holding that a jury could not determine that Hanneman was 50% at fault for the collision. We address each argument in turn, as necessary.

¶ 24 A. Summary Judgment and Our Standard of Review

¶ 25 Before addressing plaintiff's substantive arguments, we first consider the familiar standard by which we review a grant of summary judgment. Summary judgment is appropriate where the pleadings, depositions, admissions, and affidavits, if any, show that there exists no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2014); *Hancock v. Village of Itasca*, 2016 IL App (2d) 150677, ¶ 6. The trial court must strictly construe all evidence against the moving party and liberally in favor of the nonmoving party. *Griffin v. Cohen*, 2015 IL App (5th) 140408, ¶ 20. If any material fact is in dispute, or if differing inferences reasonably arise from the undisputed material facts, then summary judgment is not proper. *Id.* We review *de novo* the trial court's grant of summary judgment (*id.*), and we may affirm on any basis supported by the record (*AMCO Insurance Co. v. Erie Insurance Exchange*, 2016 IL App (1st) 142660, ¶ 19). With these principles in mind, we turn to plaintiff's first contention.

¶ 26                               B. Lack of Evidence of Hanneman's Negligence

¶ 27        Plaintiff first challenges the trial court's determination that she had presented no evidence from which a jury could find that Hanneman was negligent. In order to prevail on a claim of negligence, a plaintiff must plead and prove that the defendant owed her a duty, that the defendant breached that duty, and that an injury proximately resulted from that breach. *Bujnowski v. Birchland, Inc.*, 2015 IL App (2d) 140578, ¶ 12. On appeal, plaintiff focuses on the breach-of-duty element and argues that Hanneman breached the duties he owed to Case pursuant to section 11-601 of the Illinois Vehicle Code (625 ILCS 5/11-601 (West 2010)), particularly his duties to keep a proper lookout, to observe due care in approaching an intersection, and to otherwise drive so as to avoid a collision. Additionally, plaintiff contends that Hanneman was driving in excess of the speed limit or at an excessive speed for the conditions, which also constitutes a breach of a duty to Case.

¶ 28        Turning first to plaintiff's contention that Hanneman was driving in excess of the speed limit or at least too fast for the conditions, we note that plaintiff now offers as evidence her Rule 213(f) disclosure of the presumed testimony of Owen. Owen does not seem to have been deposed, and he did not provide plaintiff with an affidavit averring to his purported opinions. Moreover, Owen's opinions do not appear to have been before the trial court when it was considering defendants' motion for summary judgment. These circumstances raise at least two difficulties, both of which are insurmountable.

¶ 29        First, Owen's opinions are not part of the record. It is virtually axiomatic that matters neither presented to nor ruled upon by the trial court may not be raised for the first time on appeal. *Smith v. Airoom, Inc.*, 114 Ill. 2d 209, 229 (1986). Because Owen's opinions never actually made it into the record, plaintiff cannot now rely on them on appeal.

¶ 30        Next, even if plaintiff could overcome the procedural default so that we could consider Owen's opinions, the contents of a Rule 213(f) disclosure are not evidence for purposes of summary judgment. *Essig v. Advocate BroMenn Medical Center*, 2015 IL App (4th) 140546, ¶ 51. This is because a Rule 213(f) disclosure is promulgated by a party to an opposing party in order to prevent unfair surprise at trial and does not constitute a pleading, deposition, admission, or affidavit under section 2-1005(c) of the Code of Civil Procedure (735 ILCS 5/2-1005(c) (West 2014)). *Essig*, 2015 IL App (4th) 140546, ¶ 51. Thus, Owen's opinions regarding Hanneman's speed are out of bounds for purposes of this appeal: they are procedurally defaulted and plaintiff has not offered a reason to relax that bar, and in their current form as a Rule 213(f) disclosure they are simply incompetent as evidence. Accordingly, we will not consider Owen's purported opinions about Hanneman's speed.

¶ 31        Plaintiff contends that there is sufficient evidence from which a jury could conclude that Hanneman was speeding and thereby breaching his duty to drive appropriately for the conditions. Plaintiff points to the skid marks left by the tractor-trailer and the fact that, after the collision, Hanneman's truck and Case's car traveled 200 feet into an adjacent cornfield. Plaintiff argues that based on this evidence a jury could conclude that Hanneman's estimate of his speed was low. In support, plaintiff relies upon *Watkins v. Schmitt*, 172 Ill. 2d 193, 208 (1996), for the proposition that a jury may consider physical evidence, such as skid marks, to be "some evidence" of excessive speed. Plaintiff concludes that, because the evidence presents a factual issue regarding whether Hanneman was speeding, a trier of fact must resolve that factual issue. We disagree.

¶ 32    As noted, plaintiff cites *Watkins* for the proposition that the presence of skid marks can raise a factual issue regarding a driver's speed. In that case, the defendant was driving a cement truck in the left northbound lane and collided with a car that was turning into the southbound lanes from an east-west crossing street. Complicating matters, a school bus had partially turned into the westbound lane of the crossing street and was stopped at a railroad crossing for as long as two minutes. The school bus blocked the right northbound lane, and a number of vehicles were stopped behind it, waiting to continue traveling north. The school bus apparently impeded the vision of both the defendant and the driver who was attempting to turn into the southbound lanes. Further, there was conflicting testimony about the speed limit at the location of the collision: normally the limit was 45 miles per hour, but, because of construction, the speed limit might have been 35 miles per hour. The cement truck left 124 feet of skid marks, with 59 feet before the collision and 65 feet after the collision. *Id.* at 196-203.

¶ 33    Relevantly, in deciding whether summary judgment had been properly granted in favor of the defendant, the court held that, "in construing the evidence liberally in favor of the plaintiff, we believe that evidence of 124 feet of skid marks does present a factual question as to whether [the defendant] was speeding. Evidence of skid marks, 'though not conclusive, could be considered some evidence of excessive speed.' " *Id.* at 208 (quoting *Penzin v. Stratton*, 26 Ill. App. 3d 475, 480 (1974)). The court continued, noting that the lengthy skid marks raised factual questions as to whether the cement truck was traveling faster than the eyewitnesses estimated. *Id.* The court concluded that, in light of the skid marks, the question regarding the speed limit, and the defendant's own testimony that he had been accelerating past a line of stopped traffic, a jury might be able to conclude that the defendant was speeding, despite the eyewitness estimates that the truck had been traveling between 20 and 35 miles per hour. *Id.* at 209.

¶ 34    We note that the facts in *Watkins* do bear some similarities to the facts here. The only speed estimate here was from Hanneman, who believed that he was traveling at the speed limit of 55 miles per hour or slightly less. In *Watkins*, all the estimates of the defendant's speed placed him at or below the speed limit. Here, Hanneman's truck left precollision skid marks, and the truck traveled for another 200 feet after the collision; in *Watkins*, the 124 feet of skid marks conflicted with reports that the cement truck had been traveling at the speed limit or less. Thus, plaintiff proposes the same inference as that drawn in *Watkins*: the presence of skid marks and other marks totaling some 250 feet could allow a jury to conclude that Hanneman provided a low estimate of his speed and in fact was exceeding the speed limit.

¶ 35    There are, however, differences from *Watkins* that render such a conclusion inappropriate here. In *Watkins*, there were questions regarding the speed limit, which are absent here. There were also 124 feet of skid marks, which seems particularly lengthy given the estimates of the cement truck's speed. By contrast, in this case, Hanneman testified that, traveling at 55 miles per hour, his truck would take about 500 feet to come to a controlled stop. The marks here were about 250 feet in length, 200 feet of which were made while Hanneman's truck was pushing Case's vehicle in front of it into an adjacent cornfield. Given the testimony about a controlled stop requiring 500 feet, the 250 feet of marks does not seem unduly lengthy, unlike in *Watkins*. Additionally, Case's car left yaw marks, suggesting that she turned her car abruptly enough to cause her wheels to slip and mark the pavement. The eyewitness testimony indicated that Case did not stop before she began the turn, and that she abruptly turned in front of Hanneman's truck. Additionally, if Hanneman were traveling at 55 miles per hour, his truck would cover

nearly 81 feet each second. The eyewitness testimony estimated that Case began her turn about two seconds before the collision. The 55 feet of precollision marks is entirely consistent with the eyewitness accounts of the collision. If Case turned in front of Hanneman about two seconds before the collision, we would expect to see marks of 80 feet or less, allowing some time for Hanneman to react.

¶ 36    Finally, we do not read *Watkins* to mean that the presence of skid marks may always be deemed evidence that one of the parties was traveling at an excessive speed. Notably, there was no evidence in *Watkins* about the distance needed to bring the cement truck to a controlled stop. Here, Hanneman's testimony about the distance needed to bring his tractor-trailer to a controlled stop makes the 250 feet of skid marks an understandable figure. By contrast, in *Watkins*, the 124 feet of skid marks suggested that the cement truck's speed might have been greater than the eyewitnesses estimated it to be.

¶ 37    Additionally, *Watkins* relied on *Penzin* for its holding that, although the skid marks did not conclusively establish excessive speed, they could still be considered some evidence of excessive speed. *Id.* at 208 (quoting *Penzin*, 26 Ill. App. 3d at 480). In *Penzin*, there was conflicting eyewitness testimony about the defendant's speed, testimony that there was " 'a heck of an impact' " and that the other car jumped several feet in the air, and the fact that the other car jumped over a curb and crashed into a building. *Penzin*, 26 Ill. App. 3d at 480. Thus, in *Penzin*, the skid marks were actually inconsistent with some of the estimates of the defendant's speed. Here, by contrast, the skid marks do not seem inconsistent with speed estimates, and the length of the skid marks does not seem out of line with a heavy tractor-trailer coming to a stop after a collision.

¶ 38    For these reasons, then, we reject plaintiff's reliance on *Watkins*. Instead, we hold that the trial court correctly interpreted the evidence in holding that there was no evidence that could support a jury's finding that Hanneman had breached any duty owed to Case by exceeding the speed limit.

¶ 39    Plaintiff also argues that Hanneman breached duties imposed under section 11-601 of the Vehicle Code (625 ILCS 5/11-601 (West 2010)). Section 11-601(a) provides that a driver must drive reasonably under the conditions, keep a proper lookout, take reasonable care around intersections, curves, and hills, and take reasonable care to avoid collisions and other dangers when they are discovered or should reasonably be discovered. 625 ILCS 5/11-601(a) (West 2010). Plaintiff argues that whether Hanneman breached one or more of these statutory duties is a question for the trier of fact.

¶ 40    Plaintiff points to the fact that Hanneman was driving a tractor-trailer weighing some 60,000 pounds along a roadway with which he was familiar but that had dips to the north and south of the intersection that obscured the traffic traveling through them. Further, eyewitnesses did not observe Hanneman's truck until Case began her left turn. Plaintiff argues that these facts lead to the reasonable inference that Hanneman was speeding or, if not speeding, driving too fast for the conditions. Additionally, plaintiff contends that one can reasonably infer that Hanneman's ability to see Case's vehicle was compromised by the topography of the roadway near the intersection and that therefore he needed to take more care when approaching it, such as by decreasing his speed. We disagree.

¶ 41    The undisputed facts in the record show that, for some 500 feet north and some 600 feet south of the intersection of Route 2 and Roscoe Road, the roadway is effectively level. Thus, the 1100 feet near the intersection is level. The roadway was dry, and the weather was overcast

but clear, with the temperature above freezing. There were no weather-related impediments to visibility or the driving conditions. Sarabia testified that she could clearly observe the northbound traffic before the collision, although she focused on it only when she saw Case, on whom she had been focusing since Case passed the car in which she and Zarabia were riding, begin her left turn without stopping. Zarabia testified similarly; she had been talking to Sarabia as she drove, and she focused on the northbound traffic only when Case began her left turn and it became a potential issue for her driving. The undisputed evidence, then, is that there were no unusual environmental or traffic hazards.

¶ 42 In this regard, *Watkins* is particularly illuminating. The court noted that section 11-601 imposes on drivers a duty to drive at a speed proper and reasonable for the traffic conditions and "a duty to decrease their speed when approaching *any sort of special hazard* present with respect to other traffic." (Emphasis added.) *Watkins*, 172 Ill. 2d at 209. In *Watkins*, a school bus obstructed traffic in the outside lane of northbound Illinois Route 12, it obstructed the visibility of the cross traffic at the intersection, and the entire area was under construction, which might have meant a reduced speed limit of 35 miles per hour as opposed to the usual 45 miles per hour. *Id.* The court held that these conditions created a special hazard that required the defendant to adjust his driving for these conditions, specifically by slowing when approaching the school bus and overtaking it. *Id.*

¶ 43 Here, by contrast, there was no construction, no traffic disruptions, no adverse weather conditions, and no other conditions that would have posed "any sort of special hazard." In the absence of any special hazard, Hanneman was not required to take any special precautions beyond ordinary reasonable care. Moreover, plaintiff does not appear to suggest that a left-turning vehicle presents "any sort of special hazard" that requires, in the exercise of due care, adjusting speed or keeping more than normal lookout (see *id.*), and, if she does so suggest, she has failed to present any authority to support such an argument (see Ill. S. Ct. R. 341(h)(7) (eff. Feb. 6, 2013) (an argument unsupported by authority is forfeited)).

¶ 44 Indeed, section 11-902 of the Vehicle Code (625 ILCS 5/11-902 (West 2010)) sets forth the duties of a left-turning driver: "The driver of a vehicle intending to turn to the left within an intersection *** shall yield the right-of-way to any vehicle approaching from the opposite direction which is so close as to constitute an immediate hazard ***." The left-turning driver is allowed to make her turn only upon the occurrence of a safe interval. *Id.* Thus, while Hanneman was under the duties to keep a proper lookout, drive at an appropriate speed for the conditions, and avoid collisions (see 625 ILCS 5/11-601 (West 2010)), Case was under the specific duty as a left-turning driver to yield the right-of-way to all oncoming traffic that presented an immediate hazard.

¶ 45 The evidence shows that Case never stopped her car before turning left, that she turned at such a speed that her tires slipped and marked the pavement, and that, if she signaled her turn, her indicator blinked once or twice at the most. Additionally, the evidence demonstrates that Case began her turn about two seconds, or 160 feet, before Hanneman's truck struck Case's vehicle, which, based on the posted speed limit of 55 miles per hour, means that Hanneman's truck "constitute[d] an immediate hazard." 625 ILCS 5/11-902 (West 2010). Therefore, the evidence manifestly shows that Case breached her specific duty as a left-turning driver pursuant to section 11-902. See also *Reese v. Laymon*, 2 Ill. 2d 614, 623-24 (1954) (left-turning driver was the proximate cause of the accident where she failed to yield the right-of-way and

turned in front of a motorcyclist who was within his oncoming lane and was close enough to, or had entered, the intersection so as to constitute an immediate hazard to the left-turning driver).

¶ 46    Accordingly, based on the undisputed facts, we hold that the trial court correctly held that there was no evidence from which a jury could conclude that Hanneman breached any of the duties imposed by section 11-601, and particularly the duties to keep a proper lookout, to drive in accordance with the existing conditions, and to drive at a safe speed.

¶ 47    While our determination that Hanneman did not breach any duties owed to Case effectively resolves this appeal, we note that plaintiff has cited a number of cases that she believes control or at least offer significant guidance to our decision. We turn to those cases next.

¶ 48    Plaintiff cites *Guy v. Steurer*, 239 Ill. App. 3d 304, 312-13 (1992), for the proposition that Hanneman breached his duties to keep a proper lookout for other cars on the road and to avoid a collision. *Guy*, however, is inapposite. First, procedurally, at issue in *Guy* were the trial court's decisions on the plaintiff's motions for judgment notwithstanding the verdict and for a new trial. Thus there are significant procedural differences. *Id.* at 306. Substantively, the plaintiff observed the defendant's car executing a turn in the intersection, but the plaintiff did not slow, sound his horn, or otherwise attempt to avoid colliding with the defendant's vehicle. *Id.* at 309. Moreover, *Guy* acknowledged the unavoidable-collision doctrine, which applies when a motorist drives into the path of the driver with the right of way and affords that driver with no opportunity to avoid the collision, and it specifically noted that the plaintiff observed the defendant making the turn but did absolutely nothing to avoid the collision. *Id.* at 309-10. In stark contrast, here, the evidence shows that Case abruptly turned left in front of Hanneman about two seconds before the collision on a roadway with a speed limit of 55 miles per hour. Both Sarabia and Zarabia testified that, had Case stopped before turning left and allowed Hanneman's tractor-trailer to pass, there would not have been a collision. Thus, *Guy* is wholly inapposite.

¶ 49    Plaintiff cites *Salo v. Singhurse*, 181 Ill. App. 3d 641, 643 (1989), for the proposition that a driver on a preferential roadway has the duties to keep a proper lookout, to observe due care in approaching intersections, and to drive prudently to avoid a collision when a danger is discovered or, by the exercise of reasonable care, should be discovered. While plaintiff properly recites the duties involved, *Salo* held that the plaintiff—who had crossed into the intersection, relying on the defendant's obligation to obey her stop sign, and was struck by the defendant, who did not stop at the stop sign—was not the proximate cause of the collision. *Id.* Rather, the defendant, who rolled into the intersection and struck the plaintiff's car, proximately caused the collision. *Id.* Thus, *Salo* was decided not on the ground of breach of duty, but on the issue of proximate causation, and this renders it inapposite to our discussion above. However, we note that *Salo* provides an apt description of Hanneman's duties, it is factually similar to this case, and its holding is likewise apt: Hanneman was faced with an unavoidable collision and his actions were not the proximate cause of the collision in this case. *Id.* If we needed to address plaintiff's second argument in this case, we would follow *Salo*.

¶ 50    Plaintiff cites *Johnson v. May*, 223 Ill. App. 3d 477, 484 (1992), again for the proper-lookout and due-care-despite-the-right-of-way duties. Again, we acknowledge that plaintiff has properly recited duties applicable to Hanneman in this case. Plaintiff, however, has once again overlooked that the *Johnson* court determined that the collision was unavoidable because the driver corresponding to Case was the proximate cause of the collision. *Id.* at 484-85. This, again, renders *Johnson* inapposite to our discussion above

concerning whether plaintiff demonstrated any breach of Hanneman's duties to Case. And again, notwithstanding *Johnson*'s inapplicability to the issue of duty, its factual similarity would compel that we follow it if we had proceeded to consider proximate causation. The evidence in this case indicates that Hanneman was traveling at about 55 miles per hour, or about 81 feet per second. Johnson noted that a driver's reaction time is at least a second. *Id.* at 484. The eyewitnesses testified that about two seconds elapsed between Case's vehicle beginning its left turn and the collision that resulted. The evidence shows that Hanneman's tractor-trailer left 55 feet of precollision skid marks on the road. In other words, according to the witnesses, Case began turning left when Hanneman's truck was around 160 feet away from her. Hanneman recognized this and applied his brakes roughly a second-and-a-half after Case began her turn. As in *Johnson*, Case's actions left Hanneman with no way to avoid the collision, and *Johnson* would compel the same result: a holding that, because Hanneman could not avoid the collision, Case's turn in front of him was the proximate cause of the collision. *Id.* at 484-85.

¶ 51    Plaintiff also cites *Griffin*, 2015 IL App (5th) 140408, ¶ 1, because the court in that case reversed the trial court's decision on summary judgment in which it found that the plaintiff's decedent was the sole proximate cause of the fatal collision because he failed to stop at a stop sign. Once again, we note that, while plaintiff cites *Griffin* to presumably illuminate Hanneman's duties and his breach of those duties, the case was decided on the ground of proximate causation. The *Griffin* court held that there were factual issues regarding whether the defendant approached the intersection with due care. *Id.* ¶ 29. The evidence in *Griffin* showed that the plaintiff was traveling faster than he claimed, the plaintiff was driving a heavy pickup truck towing a 3000-pound trailer loaded with a 5000-pound piece of equipment for a gross weight of about 14,000 pounds, the plaintiff was traveling downhill, and the plaintiff was talking on a cell phone held to his ear even as he was trying to shift the truck's transmission while traveling down the steep hill. *Id.* ¶¶ 26-27. Finally, the evidence revealed that the defendant steered his truck into the decedent's vehicle, and even the defendant's own expert opined that, had the defendant stayed in his own lane while applying his brakes, he would have avoided colliding with the decedent. *Id.* ¶ 28. Based on these factual issues, the court held that summary judgment was improper. *Id.* ¶ 29. Further, the court held that the trial court's determination that the sole proximate cause of the collision was the decedent's failure to stop was inappropriate, where case law shows that there can be multiple proximate causes of an accident and where the evidence pointed to a possibility that the defendant's actions could also have been a proximate cause of the collision. *Id.* ¶ 31.

¶ 52    *Griffin* is inapposite to the facts of this case. First, its treatment of proximate causation is inapposite to our discussion of breach of duty. Second, even regarding the issue of proximate causation (which we need not reach), the factual distinctions preclude its application here. In this case, there is no evidence that Hanneman was traveling at a speed greater than he claimed. In fact, the evidence appears to support Hanneman's claim that he was driving at or below the speed limit of 55 miles per hour. Likewise, there is no evidence that Hanneman was speeding downhill, which might have impacted his ability to stop or to control his truck; rather, the evidence shows that Hanneman needed about 500 feet to stop and that he was proceeding along a level stretch of road. The evidence also shows that Case began her turn about two seconds before the collision, which, at Hanneman's speed of about 55 miles per hour, was about 160 feet in front of Hanneman's truck. Finally, there is no evidence that Hanneman had any

obvious distractions, like talking on a phone held to his ear while trying to downshift for a steep downhill grade, as in *Griffin*. Finally, to the extent that *Griffin* relied on a number of breaches of duty to justify its decision on proximate causation, there is no evidence in this case from which a trier of fact could conclude, without resorting to unbridled speculation, that Hanneman breached any duty to Case, such as keeping a proper lookout, driving at an appropriate speed for the conditions, or driving so as to avoid a collision. Accordingly, *Griffin* is factually distinguishable and offers no guidance in this case.

¶ 53 For the foregoing reasons, then, we hold that the trial court properly granted summary judgment on the ground that plaintiff presented no evidence of Hanneman's negligence. Specifically, plaintiff was unable to offer any evidence demonstrating that Hanneman breached any duty he owed to Case. Because plaintiff was unable to demonstrate all of the necessary elements to establish negligence, particularly the breach of any duty owed to Case, we need not consider plaintiff's challenges to the alternative bases identified by the trial court.

¶ 54                                    III. CONCLUSION

¶ 55 For the foregoing reasons, the judgment of the circuit court of Winnebago County is affirmed.

¶ 56       Affirmed.